VOGELSBURG, Respondent, vs. MASON & HANGER COMPANY, Appellant.

*February 27—April 8, 1947.*

For the appellant there were briefs by *Wilkie, Toebaas, Hart & Jackman,* and oral argument by *Oscar T. Toebaas* and *Thomas Pierce,* all of Madison.

244

For the respondent there was a brief by *Spohn, Ross, Stevens & Lamb,* attorneys, and *Frank A. Ross* and *Edwin C. Pick* of counsel, all of Madison, and oral argument by *Mr. Ross* and *Mr. Pick.*

FRITZ, J.   In relation to the issues as to whether there was causal negligence on the part of defendant and contributory negligence on plaintiff's part, the jury found (1) that defendant failed to furnish a place of employment as free from danger to the safety of frequenters as the nature of the employment, and place of employment, would reasonably permit; (2) that such failure was a natural cause of the accident, which resulted in injury to plaintiff; and (3) that he did not fail to exercise such care and caution for his own safety as an ordinarily prudent person ordinarily exercises under the same or similar circumstances.   Defendant does not claim there was any prejudicial error in relation to the first and second findings, but as to the third finding, defendant contends the court erred in instructing the jury in relation to the issue of contributory negligence.   In order to pass upon the error assigned by defendant in that respect, it suffices to note the following facts as to which there is but little conflict in the evidence.

While defendant was engaged in the construction of certain buildings and a water and sewer system as part of a plant called Badger Ordnance Works, which was to be operated by the Hercules Powder Company, the plaintiff was employed there by the latter as its supervising manager in charge of that system.   Performance of his duties in that capacity required him to inspect, on February 28, 1945, a water line constructed by defendant while it was flushing out the line to clear it from sand, gravel, and other debris.   Plaintiff and his assistant, George Johnston, were there only to see that the system was cleaned out.   Defendant's employees had temporarily disconnected the water pipe, and installed, by the use of wire instead of bolts and lugs provided for that purpose, a temporary con-

nection between the permanent water pipe and a long temporary flushing pipe to carry the water beyond the building during the flushing operation to enable plaintiff to ascertain whether the system was free of obstruction so that the sprinkler heads on an overhead sprinkler system would not clog. When defendant's employees completed connecting the flushing pipe, they turned on the water, in the presence of plaintiff and his assistant, Johnston, in order to flush out the system. The water pressure in the 8-inch pipe line was seventy pounds per square inch. While plaintiff was inspecting the line after the water had been turned on and had run for some moments, the temporary connection suddenly burst apart and released a stream of water which struck plaintiff and hurled him along from sixty to seventy feet, and severely injured him. The temporary connection parted because in attaching it defendant's employees had negligently used a piece of wire which was wholly inadequate to withstand the pressure, instead of using the bolts and the lugs with which the pipes were fitted to permit their being bolted as was customarily done. Consequently, defendant's negligence clearly warranted the jury's findings that defendant failed to furnish a safe place, as required under sec. 101.06, Stats., and that such failure was the cause of plaintiff's injury.

In relation to the issue as to contributory negligence and the jury's finding that plaintiff did not fail to exercise such care and caution for his own safety as an ordinarily prudent person ordinarily exercises under the same or similar circumstances, the only error assigned by defendant is that the court erred in instructing the jury,—in connection with other instructions which clearly were proper,—that—

"A person is not bound by law absolutely to see every defect or danger in his pathway which is plainly observable, nor even to remember the existence of every defect of which he had knowledge. He is only required to act as a reasonably prudent person under the same circumstances would act."

Defendant contends this instruction is applicable only in respect to a traveler who sustains injury because of a defective sidewalk or highway; and that as to an employee injured elsewhere than as such a traveler, there is applicable the conclusion stated in the syllabus in *Neitzke v. Kraft-Phenix Dairies, Inc.*, 214 Wis. 441, 450, 253 N. W. 579, that contributory negligence exists only where the employee, with full knowledge of existing danger and with his free choice of acting either so as to avoid that danger or so as to expose himself to it, deliberately and carelessly exposes himself to the danger. Defendant claims the giving of the instruction under review constituted error because it in effect told the jury that even though the plaintiff saw the temporary pipe connection was wired instead of being bolted, and therefore was unsafe, plaintiff was not bound in law to see every defect or danger which was plainly observable nor to remember the danger for even the few seconds or a minute until the water was turned on by the defendant; and that therefore the instruction had no place in this case and its defense that plaintiff was contributorily negligent was materially prejudiced thereby.

In relation to defendant's contention and claims in those respects, it must be noted that the instruction in question is substantially to the same effect as the trial court's instruction in the *Neitzke Case, supra* (see pp. 449, 450), in which we said,—

"The instructions were sufficient and correctly stated the law. The court was correct in refusing to instruct the jury that plaintiff was guilty of contributory negligence if it was found that he knew of the danger, either as a result of warning or as a result of his own experience. The mere fact that one having knowledge of the existence of danger continues to perform his work, does not necessarily make him guilty of contributory negligence. . . . Contributory negligence exists only where the employee, with full knowledge of the existing danger and with a free choice of acting either so as to avoid that danger or so as to expose himself to it, deliberately or carelessly acts in the latter manner."

To the same effect see *Besnys v. Herman Zohrlaut L. Co.* 157 Wis. 203, 147 N. W. 37; *Kielar v. Fred Miller Brewing Co.* 165 Wis. 237, 161 N. W. 739; *Janiak v. Milwaukee Western Fuel Co.* 156 Wis. 544, 146 N. W. 788.  Consequently, the instruction in question here was correct; and it was clearly applicable in view of evidence as to the following facts which warranted the jury in finding that there was no contributory negligence on the part of plaintiff, to wit: He stood where he was at the time of the accident in order to hear and to feel whether or not all of the debris had been cleared from the system.  One could not always see the pipe expel foreign material by watching the water as it comes out of the pipe into a ditch which had water in it, and he and Johnston could not see what was in the pipe and sent out into the water.  Occasionally he walked over and put his hand on the pipe and could feel rocks bumping along the bottom to be flushed out, and he wanted to put his hand on the pipe instead of looking at the flow because he wanted to be sure it was flushed. Even if there may be some conflicts in the evidence,—the jury could find that to do his job it was necessary for plaintiff to stand near the pipe as he did to hear and feel the debris pass in order to be sure of a complete flushing, and that he did not deliberately or carelessly expose himself.  Consequently, the jury's finding in relation to contributory negligence must be sustained.

That plaintiff sustained serious injury as the result of the accident on February 28, 1945, was established beyond dispute.  However, defendant contends there is no credible evidence to establish to a reasonable certainty the jury's findings that the stroke and paralysis sustained by plaintiff on July 30, 1945, was the natural and probable result of the injuries received from the accident on February 28, 1945; and that the damages for all personal injuries suffered by plaintiff as the result of the accident on February 28, 1945, and the stroke and paralysis on July 30, 1945, amount to $16,500.  Defendant's contentions in those respects are based on its claim that

the court erred in permitting plaintiff to introduce, over defendant's objections, testimony given by Drs. T. J. Nereim and M. J. Musser as to their opinions that the stroke on July 30, 1945, was caused by the accident and the injuries sustained by plaintiff on February 28, 1945. Defendant claims the stroke was the result of a thrombosis of the left lenticulo-striate artery in the brain; and that plaintiff failed to prove by a preponderance of credible evidence to a reasonable certainty that the accident and injuries on February 28, 1945, caused the thrombosis which resulted in the stroke five months later. Defendant claims the opinions to the contrary, testified to by Drs. Nereim and Musser, rest on merely speculation, conjecture, and vague generalities that in some unexplainable manner the industrial accident did something to the plaintiff which produced the delayed stroke.

Dr. A. G. Sullivan,—who became and continued to be plaintiff's attending physician after Dr. Nereim had examined and given him first-aid treatment at the plant hospital immediately after the accident,—testified, when called as a witness by defendant, that he thought the stroke was the result of a hemorrhage of the lenticulostriate artery in the brain. Dr. Musser, who examined plaintiff as his physician shortly after he had the stroke, and who took a history with a view of finding the cause thereof, testified, as a witness called by plaintiff, that he thought because of the relatively slow development of the symptoms of the stroke, it was more probably the result of a thrombosis of that artery, but that whether it was a thrombosis or a hemorrhage is an academic question, as both are vascular accidents covered by the term paralytic stroke. There apparently was, however, no direct evidence whatever on the trial that as a result of the accident on February 28, 1945, the left lenticulostriate artery then sustained any injury which caused the narrowing of the artery that five months later produced the stroke.

In order to pass upon defendant's contentions and claims in the respects last stated, there must be noted the following matters which are established with apparently virtually no conflict in the evidence. Plaintiff was sixty-three years of age at the time of the accident. When he was struck and hurled along by the stream of water he was unconscious for a short period and woke up in the water, and his assistant, Johnston, came immediately and picked him up. He was able to walk to the car with the help of fellow employees who took him to the first-aid hospital at the plant. There Dr. Nereim spent about two hours dressing the wounds and attending to the injuries, and then plaintiff was put to bed and remained there until 5 o'clock when he was transported by ambulance to the Madison General Hospital. There was no fracture of the skull; but he had a laceration and a deep cut penetrating to the calvarium at the base of the skull; an abrasion of the right leg, and the left elbow, and over the left temple area and nose; a hole and some loss of tissue above the left eye; and a chip fracture of the lateral condyle radius of the right wrist, and a dislocation of the small bone of the wrist. Dr. Nereim spent considerable time cleaning out the wound at the base of the skull, which was filled with gravel. The dislocation of the bone in the wrist was unreducible and that arm was splinted. Three blood-pressure readings were made while at the plant hospital, viz., at 2 p. m., 130 systolic over 160 diastolic; at 3:30 p. m., 188 over 106; at 3:40 p. m., 178 over 106; at the Madison General Hospital at 5:15 p. m., 158 over 94; and between February 28 and March 2, 1945, 158 over 94, and in October 1945, 170 over 106. On prior examinations his blood pressure was 134 over 88 in May, 1942, and 144 over 100 in June, 1943.

After two days' stay at Madison General Hospital, plaintiff was able to ride home in Dr. Sullivan's car on March 2, 1945. On March 9, 1945, he returned to the hospital for one day

when Dr. Sullivan attempted to reduce the dislocation of the wrist but was unable to do so. He also received many treatments for his wrist at the plant hospital, but the swelling incident to the dislocation was so substantial that the bones were never properly set; and he suffered a great deal of pain and sustained a serious permanent injury to the wrist resulting in limitation of motion and use. On July 15, 1945, his wrist was still swollen, and in the month of July he had pain in the wrist which annoyed him. With the exception of the wrist he recovered from the other injuries stated above. The injury on the back of his head healed up in about a month, and the injury over his eye took a little longer. Plaintiff spent four weeks at home. Near the end of March, 1945, he was able to return to part-time work at the plant for about a month; and in May, June, and July he did most of his work on a full-time basis at the office, but would go out in the car to drive to the several plants, the pump house, and sewage plant. After his wounds were first dressed at the plant hospital he had, according to his testimony, dizzy spells which lasted a minute or something like that, and in Madison, for about a week after the accident, he had dizzy spells which would last half a minute more or less, but not a long time. From February 28 to July 28, 1945, he had headaches off and on, but did not know how often. At the time of the accident he weighed one hundred sixty to one hundred sixty-five, but on July 28, 1945, he weighed one hundred fifty pounds. About the middle of July, 1945, he felt logy, and did not have much ambition. He went to bed early, and was not the same man that he had been in February, 1945. The last week he worked he had no difficulty carrying on his work as far as he knew, and the last Saturday, July 28, 1945, he worked all day at the plant and felt as good as usual at that time. On Sunday, July 29, 1945, plaintiff held a hose for his son-in-law, who was mixing some concrete, and later they went fishing in a boat. Upon returning he noticed some difficulty with his legs, which were kind

of stiff, and his daughter helped him out of the boat. He noticed he could not climb up on the dock like he usually did. He went home that evening and at 5 o'clock the next morning, in trying to get out of bed, he noticed he could not walk. At 6 o'clock his condition was about the same and so they called Dr. Sullivan. Slowly the trouble affected his right arm and his speech. On arrival Dr. Sullivan said he had suffered a stroke. No immediate activity on his part could be assigned as the cause of the paralytic stroke. Although there had been some improvement up to the time of the trial, his right side was more or less paralyzed. Plaintiff was never a worrier before the accident, but thereafter he worried and did not sleep well at night, and had headaches. Dr. Nereim testified that after the accident there was a very marked change in plaintiff's personality in that he was grim and despondent and seemed sort of thin and gray, and much more gray and senile looking than he had been; that he was very much concerned about his arm, which was giving him a lot of trouble, and he was constantly moving and exercising it and talking about it; and that his actions were slower, and he was not as quick and alert as he had been, and did not enter into the discussions around the table as he did before.

Under the evidence as to the facts stated above, it appears that arteriosclerosis and hypertension were present in plaintiff's case in 1943, with a high blood pressure of 140 over 100, which was a rise of 12 points in the latter since 1942, when the diastolic was 88; that arteriosclerosis and hypertension are progressive diseases and were present to an advanced degree of 130 over 106 about three hours after the accident on February 28, 1945, and of 150 over 94 six hours thereafter; and were likewise present to a further advanced degree of 170 over 106 on July 30, 1945, the date of the stroke; that thus it is evident plaintiff had all of the pathological factors and symptomatic characteristics which naturally lead to a paralytic stroke from the progress of arteriosclerosis and hypertension;

and that his hypertension and arteriosclerosis was a sufficient adequate cause and could have produced the stroke irrespective of the industrial accident. And defendant contends the proof as to said diseases fully and definitely established that they,—instead of the accident,—were the causes of the stroke.

Furthermore, as defendant claims, there is no competent or credible evidence of a skull fracture, blood clots, brain injury nor prolonged or repeated intervals of unconsciousness, or impairment of speech, hearing, sight, feeling, or smell, nor of disturbance of motor reflexes or mental difficulties in carrying on his work upon plaintiff's return to the plant during the balance of the period of five months. Dr. Sullivan, who treated plaintiff during that period and thereafter, testified there was no evidence of brain injury at any time on the basis of his observation and experience with plaintiff while seeing him professionally every week or two up to the time of the stroke. Neither Dr. Sullivan nor Dr. Nereim took any X-ray photographs of plaintiff's skull, or testified that there was bleeding from the ears or nose or staggering gait, or that there were any objective findings to prove that plaintiff sustained a traumatic injury to the brain. Likewise, Dr. Musser found no evidence of a lesion nor a blood clot in the brain after a thorough scientific examination with the aid of electrical recording instruments and X-ray studies. As the left lenticulostriate artery, which was involved at the time of the stroke, was deep in the internal capsule of the brain on the left side, and well protected by brain tissue, brain fluid, brain covering, the skull, skin, and hair, it would have taken a considerable blow to have damaged it. If a blow, as the result of the accident, had damaged that artery, it seems highly improbable that none of the other blood vessels in that area of the brain, many of which are close to the surface thereof near the site of the trauma, would not have been likewise injured then so as to disclose some evidence thereof which would have been discovered by the physicians then attending plaintiff.

The error assigned by defendant on the ground that the court erred in admitting over its objections testimony by Drs. Nereim and Musser in relation to the issues as to the cause of the stroke and the competency and sufficiency of the testimony to establish such cause to a reasonable certainty, arises in part by reason of the following proceedings. After calling and examining Dr. Nereim as to plaintiff's injuries and physical condition, he was asked by plaintiff's attorney:

"*Q.* Now, Doctor, if I add to the fact in my last question, namely, the wound as you saw it, plus the fact that he was unconscious for a short space of time; the fact that after the accident and for the next week or so he had dizzy spells, and that after the accident until July 30th, he suffered from frequent general diffused headaches, *have you an opinion as to whether or not the accident caused a brain injury? A.* Yes."

Defendant's attorney objected to the question and moved to strike out the answer *because the question does not ask* the doctor *if he can so testify to a reasonable certainty.*

Plaintiff's attorney: "I am willing to stand on the question as I asked it."

The Court: "The answer may stand. Objection overruled.

"*Q.* What is your opinion? *A.* My opinion is, *there must have been a hemorrhage into the brain as the result of the blow.*"

Defendant's attorney: "I must move to strike out the answer as argumentative—'*must have been a hemorrhage into the brain,*' based on no clinical findings whatever. *Pure opinion, based on speculation and conjectures* on whether or not this type of a cut or blow on the head would produce any hemorrhage."

Plaintiff's attorney: "The doctor has already testified that these are the symptoms from which you determine and diagnose the situation on the basis of these—"

The Court: "Objection overruled. The answer may stand."

Plaintiff's attorney: "Now, is a person who has a mild hypertension and who is suffering from anxiety and worry and has undergone a personality change *likely* to have a lighting

up of the hypertension and increase of the hypertension which may cause a stroke? *A. That is possible."*

Defendant's attorney: "I object to that question again *because* it calls for and invades the field of conjecture and speculation again. *It is not based on whether it is a reasonable certainty. . . ."*

The Court: *"The objection overruled. . . .*

*"A.,* Anxiety and worry are factors which increase hypertension, aggravate the condition and, when the pressure is increased, the *possibility* of rupturing a blood vessel is naturally greater; and the higher the pressure in the individual, the greater the *possibility* of a vessel snapping."

The witness testified also: *We cannot determine with absolute certainty what caused the rupture* of the artery or *the clot in the artery. We know that certain factors predispose* to that sort of an accident. In view of the injury to plaintiff, there was a predisposition created toward a stroke in this case.

Then in a lengthy question stating the nature of the accident, and plaintiff's conduct thereafter, plaintiff's attorney asked:

"Now, assuming all of these facts, and upon the basis of such assumption and upon the basis of your knowledge and examination of Mr. Vogelsburg and the condition that you have seen him in, have you an opinion as to whether there is a causal relationship between the accident of February 28th, and the stroke of July 30th?"

Defendant's attorney: "Just a minute. The question is objected to *because it does not ask for an opinion based on a reasonable certainty* upon the medical experience of this man."

The Court: "Do you want to include that in that question?"

Plaintiff's attorney: "No. I think the question is proper."

The Court: "All right. Objection overruled. He may answer.

"*A.* Yes.

"*Q.* You can answer yes or no. What is your opinion? *A.* All these months of constant worry—first, we have an initial severe trauma, with a loss of function of one member; many weeks of worry that could give. *It cannot be said with any positive certainty* necessarily, but *it is my opinion* that there is a definite relationship between the stroke and the severe traumatic injury that he had some weeks before."

Then in answer on cross-examination to defendant's attorney's question: "Now then, Doctor, whether in this case it was the natural progress of arteriosclerosis and hypertension, and whether, on the other hand, it was hypertension and arteriosclerosis and the effect of this accident five months previous, *you have got to speculate* on which one it is in order to make an answer, haven't you?" Dr. Nereim answered, *"That is right."*

Thus it is obvious from the above-stated proceedings, and particularly the italicized portions thereof,—that because of the overruling of defendant's objections, the jury, in determining that the stroke was caused by the accident and injuries on February 28, 1945, was permitted by the court to take into consideration testimony which, instead of being proof that was competent and sufficient to establish that fact to a reasonable certainty, was merely testimony which was but speculative and conjectural. A finding based on such proof cannot be sustained. *Matuschka v. Murphy,* 173 Wis. 484, 492, 180 N. W. 821; *Loomis v. Industrial Comm.* 216 Wis. 202, 256 N. W. 693; *Creamery Package Mfg. Co. v. Industrial Comm.* 211 Wis. 326, 330, 248 N. W. 140; *Walraven v. Sprague, Warner & Co.* 235 Wis. 259, 292 N. W. 883.

There is also testimony by Dr. Musser to the following effect:

When he first examined plaintiff after the stroke on July 30, 1945, and was given his history, and later made another examination, he concluded that plaintiff had suffered a cerebral accident in the form of an occlusion,—a thrombosis of a certain blood vessel in the brain; that when a cerebral accident of this character is severe there is likelihood of recurrence and sudden stroke, and it is certainly more possible than if there had been no accident to begin with,—when any tissue is once damaged it is always more vulnerable to the second attack. Then, in answer to a lengthy hypothetical question which stated many facts, and which concluded with: "Now, assuming all these facts, on the basis of such assumption, and upon the basis of your examination on October 1, 1945, and the

condition you then found him in and in the subsequent examinations of him, have you an opinion as to whether the accident of February 28th was a *probable* cause of the stroke of July 30th." Dr. Musser testified: "Well, from the standpoint of head injury alone, unless a person develops a paralysis or some rather striking change in their mental reaction or their ability to move about, their motor reaction, it is *impossible to say that an injury was directly responsible for what might have happened two or three or four or five months later.* However, there are some other factors in those circumstances which I think are important. One, is the fact that there has been apparently an increase in the blood pressure from before the accident to the time of my examination. In other words, there has been an increasing blood pressure, which would make the man more vulnerable to a cerebral accident. And two, he has demonstrated changes in his emotional stability, in his memory and in his personality, and his attitude, which could have resulted from some amount of injury to the brain at the time of the accident; but which may also have resulted from the mental shock that this accident was. Along with all the physical injury that you get at the time of injury, it also does something to your emotional system; and . . . it is apt to upset a person severely. This man has been an active person, and, at the age of sixty-three, was forced to lead a sedentary life. He worried a great deal, became irritable and tense; was concerned about his condition; and that factor is apt— very often will keep blood pressure up, and again make an individual more vulnerable. *So that I feel that, while the blow on the head or the injury as such cannot be stated irrevocable as the cause of this man's stroke,* that *other factors*—other things *happened* to this man *in a rather chronological sequence that* in him, as an individual, *made it much more probable for him to have a cerebral accident.*"

However, on cross-examination Dr. Musser testified:

"*Q.* Now, in this particular case, Dr. Musser, without repeating, but considering the case of Mr. Vogelsburg that if he had no industrial accident February 28th, and this rise in diastolic pressure, hypertension, arteriosclerosis, the myocarditis of the heart, and those other matters you found, *he may well have had this stroke on July 30th without the industrial accident. A.* That is right. . . .

"*Q.* Now, the amount of worry and anxiety is a matter of relative degree, isn't it? *You cannot say to a reasonable certainty* how much worry and anxiety a man at sixty-three must undergo before it steps up his blood pressure, can you? *A. No sir.*

"*Q. Nor over how long a period of time? A. No sir.*" *I cannot answer these questions to a reasonable medical certainty.* As I said before, Mr. Vogelsburg *could have had the stroke* on July 30th *without this accident in February.* . . . If this paralytic stroke had occurred within a week after this accident, a physician would be in a much sounder basis to say the industrial accident was the cause. The longer time between February 28, when the man was injured, and to the time he had a stroke, July 30, the more difficult it is to say that the industrial accident was the cause of the stroke. . . . A man who is suffering from a slight degree of hypertension and some degree of arteriosclerosis is more vulnerable as a result of an industrial accident and a trauma such as suffered here on February 28th, than a normal man. *It would be pure speculation to say that* the lenticulostriate artery *had suffered a slight bleeding following this industrial accident.*

Considering this testimony in its entirety and most favorably to plaintiff, it cannot be deemed to establish to a reasonable certainty that the accident and injury sustained on February 28, 1945, was the probable cause of plaintiff's stroke. And that certainty cannot be deemed established when there is taken into consideration also the testimony of defendant's witnesses, Drs. Sullivan, Tormey, and Powers, each of whom testified that in his opinion, based upon reasonable probabilities, the accident was not the cause of the stroke five months later. In that connection, Dr. Sullivan testified there was no connecting evidence of any nature and the stroke came out of a clear sky as the man was improving. Dr. Tormey testified he could not reason how, after four or five months had passed by and the man was active, the accident in February could be a cause of his apoplexy in July; that the blood pressure and the hardening of the arteries in this case was a sufficient adequate cause to produce the paralytic stroke on July 30th without the accident in February. Dr. Powers testified there is

nothing about this accident, and the facts as to how he was injured, that could in any way have caused the lenticulostriate artery to start narrowing after the accident; that there was nothing about the headaches and dizzy spells after the accident that would cause the lenticulostriate artery to narrow; and that the high blood pressure and the arteriosclerosis is a sufficient cause to produce the stroke here without the experience of the industrial accident.

As the trial court rightly stated in his decision,—

"There is no question that the medical testimony presented on the part of the defendant is more certain, logical and convincing, and this court would have made such answer if it were a part of the jury or had tried the issue without a jury;" and also stated, "We are therefore in a field where no positive or direct evidence can be produced to show the relationship between the injury and subsequent disability."

Moreover, there is no direct evidence whatever in this case that there was any thrombosis, or rupture or hemorrhage as a result of the accident. The only thing upon which the experts base their conclusion as to the cause of either of such conditions is sought to be established by their own opinion that such condition did exist. Under these circumstances there is applicable the conclusion stated in *Bucher v. Wis. Cent. R. Co.* 139 Wis. 597, 606, 120 N. W. 518, that "the verdict of a jury founded only upon the opinion of experts concerning the cause of a condition, which condition is itself established by the opinion of experts, has no such weight." Likewise there are applicable the statements in *Dreher v. United Commercial Travelers,* 173 Wis. 173, 178, 179, 180 N. W. 815:

"The only evidence, therefore, from which it may be inferred that external injury caused the death is the evidence of the doctor that a blow which caused the mark on his temple might have caused death, and that because he was dead it was his opinion that he died as the result of such a blow. The opin-

ion of the physician as to the cause of death is invoked to supply the substantive facts necessary to support his conclusion. This cannot be done. . . . The basis of the conclusion cannot be deduced or inferred from the conclusion itself. In other words, the opinion of the expert does not constitute proof of the existence of the facts necessary to support the opinion." See also *Walraven v. Sprague, Warner & Co., supra.*

It follows that there cannot be sustained the jury's findings that the stroke sustained by plaintiff was the result of plaintiff's injuries in the accident; and that the damages sustained therefor by him as the result of the accident are $16,500. Consequently, the judgment must be reversed because of the errors in the respects stated above. However, as there was no error affecting the findings that there was a causal failure on the part of defendant to furnish a safe place as required under sec. 101.06, Stats., and that there was no contributory negligence on plaintiff's part, and as upon those findings plaintiff is entitled to recover herein such damages as he sustained as the result of the accident, these findings and the trial court's adjudication in respect thereto will be permitted to stand and a new trial will be granted on solely the issue as to the amount of damages to be assessed by the jury for plaintiff's injury in accordance with the conclusions stated above.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings as directed in the opinion.