Sharkey, Respondent, vs. Michels and another, Appellants.

*March 10—April 12, 1949.*

For the appellants there were briefs by *Roberts, Roe & Boardman,* attorneys, and *Walter M. Bjork* of counsel, all of Madison, and oral argument by *Mr. Bjork.*

*J. L. McMonigal* of Berlin, for the respondent.

MARTIN, J.    The first question on this appeal is whether there is ample credible evidence to support the finding of the jury on the question of causal relation between the accident of March 1, 1947, and the injuries complained of by the plaintiff. A consideration of the relevant facts is necessary.

The plaintiff testified that at the moment of the impact his car went up on its right wheels and as it settled back he struck his head about two or two and one-half inches above his left ear on the window frame of the left door.    It was with sufficient force to render him unconscious for at least two minutes. It is conceded that except for an area of tenderness at the site of the blow, there was no objective evidence of injury.    According to Sharkey's testimony, he had an awful pain in his head.    If someone had asked him to do something, he could not have done it.    He did not know where he was for a while. Everything was dark in front of him.    He tried to take the license number of the other car but could not do so because he could not see four feet ahead of him.    He was dizzy.    That condition lasted from ten to fifteen minutes.    He then parked his car at the curb, walked about two blocks to the city hall to place a long-distance telephone call, walked back to his car, and drove to his insurance agent's house to report the accident. He then drove his car home, which is about one and one-half miles from the city hall.    The evidence is clear, therefore, that the plaintiff sustained some injuries.    The issue is whether they were as serious and as extensive as claimed by him.    Dr. Bennett, defendant's medical examiner, testified that she believed plaintiff told the truth about his complaints.

Plaintiff testified that since the accident he has experienced continual headaches, dizziness, sleepiness, grinding noise in the left side of his head, a loss of hearing in his left ear, and an inability to do any work, especially bending over to the left, and that his condition has not improved.

Three days following the accident, March 4, 1947, and about forty times subsequently, plaintiff was attended by Dr. H. C. Koch, his family physician. He then went to a doctor specializing in ear, nose, and throat practice at Oshkosh, Wisconsin, and was by that doctor referred to Dr. Quade, a neurologist at Neenah, Wisconsin. He was admitted to Wisconsin General Hospital on December 9, 1947, where he was hospitalized for about nine days and given extensive examination and treatment.

Dr. Koch testified as follows :

"Q. Mr. Sharkey testified he subsequently went to Dr. Quade. When did you next see him? A. I saw him on July 12th after he had been to see Dr. Quade. He wasn't able to work; he still complained of noises in his head and almost continuous headaches.

"Q. Up to this time had you been able to make a definite diagnosis of his condition? A. No, except it was one of those group of symptoms that follows head injury very often.

"Q. What do they call that, doctor? A. They call that a post-traumatic cerebral syndrome.

"Q. And what does it mean, for the benefit of us laymen? A. It simply means he got a bump on his head which must have injured some part of his brain or nervous system which causes the symptoms."

See *Buschman v. Olson* (1947), 251 Wis. 635, 639, 30 N. W. (2d) 252, for a similar problem confronted by the attending physician.

Dr. Koch testified further relating to the absence of laceration, swelling, and bleeding :

"Q. The first time you examined him, did you find any external evidence of injury? A. No, there were no cuts that I seen.

"*Q*. Any swelling or bruising? *A*. There is no record of any.

"*Q*. What is the medical probability of a person sustaining an injury to the head without those external signs? *A*. Oh, it is very common."

Dr. Coon, superintendent of the Wisconsin General Hospital, did not testify, but the evidence shows his diagnosis a "post-traumatic Meniere's syndrome without vertigo."

Dr. Bennett testified negatively that from her examination, made eleven months after the accident, she could find no evidence whatsoever that plaintiff sustained injuries as a result of the accident of March 1, 1947, but she believed he was telling the truth about his various complaints.

The evidence reveals that the plaintiff as early as 1928 suffered from some loss of hearing in his right ear; that in 1930 he sustained a severe skull fracture while doing carpentry work, when an elevator apparently struck him on the head; that he had a subsequent mastoid operation on his right ear and that a buzzing in the right side of his head necessitated the use of a hearing aid in 1942. The record further shows that plaintiff was totally incapacitated for about two years after the skull fracture; that he gave up his regular employment as carpenter and that he engaged himself as a truck farmer. It is undisputed that from 1936 until March 1, 1947, he did all of the work on his farm. In 1942, he successfully passed a physical examination which he was required to take as a condition of receiving industrial employment, and for two years he held this industrial job in addition to doing his farm work.

Regarding the industrial employment, plaintiff testified:

"*Q*. What kind of work were you doing for them? *A*. Anything they had. I got shoved around quite a bit, I could go up on the roof and lay roof boards and look down twenty-five feet and it didn't bother me. Sometimes when they run short of help in the other rooms I worked twelve hours a day seven days a week for over two weeks."

Plaintiff testified positively that in 1936 he had fully recovered from the old head injury and was in good health prior to March 1, 1947. Dr. Koch had attended him several times prior to this accident, and plaintiff never complained of any trouble with his head. He testified that plaintiff's injury and complaints resulted from the accident of March 1, 1947.

In *Biever v. Szultek* (1948), 253 Wis. 134, 33 N. W. (2d) 246, with respect to the injuries sustained by Esther Biever, the defendants objected that there was no objective basis for her symptoms and no evidence of a causal relation between her alleged injuries and the accident in question. The court stated (p. 137):

"It was the opinion of the doctors that she had suffered a minor concussion in the accident, that her nervous complaints, as well as the disturbances to her menstrual periods, were the result of a psychoneurosis caused by the accident. It appears clearly to us that the medical testimony in combination with the fact that Esther had been completely healthy up to the time of the accident established the causal relation of the accident to whatever injuries she has sustained."

*Vogelsburg v. Mason & Hanger Co.* (1947), 250 Wis. 242, 26 N. W. (2d) 678, is distinguished at page 136 of 253 Wis. The factual situation between the injuries sustained by that plaintiff and the effects claimed to have resulted therefrom, make it also distinguishable from the present case.

Defendants have also cited *Salo v. Dorau* (1927), 191 Wis. 618, 211 N. W. 762, in support of the proposition that the medical testimony based on merely subjective symptoms has but little probative force. In that case plaintiff's attending physicians found no basis whatever for the injuries he claimed.

In *Dabareiner v. Weisflog* (1948), 253 Wis. 23, 33 N. W. (2d) 220, it was stated in syllabus 2:

"Where there was a sharp conflict in the medical testimony as to whether the plaintiff's injuries were of traumatic origin, it was the jury's duty to determine whose testimony was more credible, if the plaintiff's medical witness was a competent witness."

The evidence supports the finding of the jury and the trial court that there is a casual connection between the accident of March 1, 1947, and the injuries complained of by the plaintiff.

The second question is whether the assessments of damages by the jury, as reduced by the trial court, are the lowest amounts that a fair and impartial jury could have awarded to the plaintiff.

We have already discussed in detail the plaintiff's physical complaints which have not improved since the accident of March 1, 1947, and the medical care he has sought to secure relief.

It was stated in *Butts v. Ward* (1938), 227 Wis. 387, 404, 279 N. W. 6:

"Compensation for pain and suffering is hard to measure, and must rest in the discretion of the jury, guided by common sense."

Dr. Koch testified as follows in regard to the permanency of plaintiff's injuries:

*Q.* Doctor, are you able to state with reasonable medical certainty, based on your training and experience, whether Mr. Sharkey's condition is permanent or otherwise? *A.* Well, I would say it looks to me like it is permanent because it hasn't changed any from the first time I saw him until May 4, 1948. Always the same complaint."

Defendants have relied upon *Wenneman v. Royal Indemnity Co.* (1947), 251 Wis. 630, 30 N. W. (2d) 250, in which case plaintiff's own physicians were unable to find any support for the injuries claimed to have been sustained by the plaintiff. Following the accident he was off work as a bus driver for about twenty days. Then he took a week's vacation with pay, and returned to his regular employment and performed his usual and ordinary work in the usual and ordinary way. His pay was increased and he worked longer hours. He also continued to follow his orchestra work, playing two and some-

times three nights a week as before. These facts make it readily distinguishable from the present case.

See *Parr v. Douglas* (1948), 253 Wis. 311, 324, 34 N. W. (2d) 229, relating to awarding damages for personal injuries based on economic conditions.

Under all the facts, we are unable to say the damages, as reduced by the trial court, are excessive.

*By the Court.*—Judgment affirmed.