HICKS and wife, Respondents, vs. NEW YORK FIRE INSUR-ANCE COMPANY and others, Appellants.

*February 2—March 2, 1954.*

For the appellants there was a brief by *Wolfe, O'Leary & Kenney,* attorneys, and *Kenneth M. Kenney* of counsel, all of Milwaukee, and oral argument by *Kenneth M. Kenney.*

For the respondents there was a brief and oral argument by *Charles O. Payant,* attorney, and *James A. Fitzpatrick* of counsel, both of Watertown.

GEHL, J.   Defendants' only contention is that the evidence does not sustain the jury's finding.  The residence was equipped with an oil-burning hot-water heating system.  At the time in question plaintiffs were in Florida.  They had provided a friend, Herbert Lange, with a key to the house. When he entered the house on February 26, 1950, he found that a radiator on the third floor was leaking and that the water had soaked the entire first and second floors.  Plumbers were called and found a broken radiator on the third floor.  They turned off the water in the basement, shut off the burner, disconnected the broken radiator, and plugged the pipes which served the radiator.  The system was then refilled and the burner set in operation.

On the next day one of the plumbers went to the house and checked the burner, the pressure on the boiler, the

pressure-relief valve, and the aquastat. He found the entire system functioning properly. An aquastat is a temperature control; when the water in the boiler reaches a fixed temperature the aquastat operates to shut off the burner.

The case of the plaintiffs rests principally upon the testimony of Ernest A. Biefeld, a heating engineer of many years' experience. In December, 1952, he checked the heating system and examined the radiators in each of the rooms of the house. When asked whether in his opinion the break in the radiator was caused by freezing, he answered that he did not think so.. He explained that if there had been a "freeze-up" ice would have been found at the same time in the lavatory trap, the toilet bowl, and tank in the bathroom. It was his opinion that the break was caused by "excess pressure," and to demonstrate what he meant by "excess pressure" he testified "we will say that the aquastat is calling for heat and the burner goes on. As the water gets hotter in the boiler it must expand somewhere. If the expansion tank has not got an air cushion and the relief valve is not operating properly, this excess pressure is building up in the system and the pressure keeps on building up and building up until somewhere in the system some weak spot will blow out or break completely out under excess pressure."

The basis for Biefeld's conclusion appears quite clearly from the following abstract of the testimony:

I have concluded that the break in this radiator was not the result of freeze-up, principally because I saw no other or know of no other damage to radiators on the third floor where this radiator was located, and also no more additional damage on this radiator, and because of the physical appearance of the radiator. I have concluded that it was due to the build-up of pressure within the system, although I have no direct information that there was any failure of the pressure-relief valve, or that there was any failure of the aquastat, or, in fact, a variance or override in the operation of the aquastat, and despite the fact that I have no information that there was

a deficiency of air within the expansion tank, and basing such conclusion on the known facts that the thermostat was set at 70 degrees, the aquastat at 200 degrees.

It is defendants' contention that the opinion of plaintiffs' expert is based solely upon unestablished assumptions. Upon cross-examination the witness testified that to produce an excessive pressure three factors must exist simultaneously: (1) A failure of the pressure-relief valve; (2) failure of the aquastat; and (3) a deficiency of air in the expansion tank. There is no adequate evidence that at the time of the break of the radiator any of these factors existed. Biefeld's opinion must be found to be based solely upon his unwarranted assumption that they did exist and his testimony is but speculative and conjectural and a finding based thereon cannot be sustained. *Walraven v. Sprague, Warner & Co.* 235 Wis. 259, 292 N. W. 883; *Vogelsburg v. Mason & Hanger Co.* 250 Wis. 242, 26 N. W. (2d) 678; *McGaw v. Wassmann,* 263 Wis. 486, 57 N. W. (2d) 920, 58 N. W. (2d) 663.

Plaintiffs contend, however, and the trial court reasons that, assuming the foregoing to be correct, there is testimony which the jury was entitled to believe and upon which Biefeld relied in part as a basis for his conclusion that one or more of the attachments did fail to operate. They call attention to testimony that such failure could have been produced by rust, dirt, or sediment in parts of the heating system. In 1948 the system was rebuilt for pressure circulation. Biefeld testified that in an old system of the type in plaintiffs' residence there is a certain amount of sand and dirt and that when a change, such as was made here, is made some of the dirt and sand works its way into the radiation; if the relief valve should happen to get stuck there is added pressure and "somewhere down the line some weak spot, through the excess pressure, will blow out or break loose."

It may be conceded as a matter of practical knowledge that dirt or rust in one of the attachments might cause it to fail to operate so as to relieve the system of excessive pressure. But it does not appear that Biefeld knew of the presence of dirt, rust, or sediment in any of the attachments or that he based his opinion upon his discovery of the presence of either of such elements. He did find some substance on the piece of the radiator which had broken out and which indicated to him that sand was in the system, but did not go beyond that and say that the substance on the piece suggested the presence of any foreign substance in either of the attachments.

He made no examination of either of the three elements to ascertain whether their operation had been affected by a foreign substance, nor did he examine the expansion tank to find whether there had been a deficiency of air in it. Most convincing against plaintiffs' contention as to the presence of a foreign substance in the attachments and the fact that it might have caused the break is Biefeld's statement that he did not include as a basis for his opinion the possibility that the relief valve and the aquastat had been cleaned out on the day after the break as was testified to by Donald Kehr, one of the plumbers.

Plaintiffs lay particular emphasis upon the testimony of Donald Kehr just referred to and upon an invoice furnished him by the plumbing firm which contains an item under date of February 27, 1950, "clean out pressure-relief valve and aquastat." Neither the testimony nor the invoice warrant the inference that the dirt which was removed had caused either of the attachments not to function. In any event, Biefeld eliminated the fact as a basis for his opinion.

*By the Court.*—Judgment reversed. Cause remanded with directions to dismiss the complaint.