VONASEK and another, d/b/a VONASEK AND SCHIEFFER, Appellant, v. HIRSCH AND STEVENS, INC., Respondent.

*No. 231. Argued September 10, 1974.—Decided October 1, 1974.*
(Also reported in 221 N. W. 2d 815.)

1

For the appellant there were briefs by *Thomas J. Bergen*, attorney, and *Ted B. Johnson* of counsel, all of Milwaukee, and oral argument by *Mr. Bergen*.

For the respondent there was a brief by *Francis J. Wilcox* and *Wilcox & Wilcox*, all of Eau Claire, and oral argument by *Francis J. Wilcox*.

CONNOR T. HANSEN, J.  The plaintiff had the general contract to build certain buildings, including the gymnasium which is the building included in this appeal, for the owner, Barron county, on the Rice Lake Campus of Stout State University. The principal duties of the defendant-architect were to aid the owner in selecting a contractor, award contracts, prepare plans and specifications, act as arbitrator in disputes between the owner and the contractor and to oversee the contractor's work for conformity with the contract documents, plans and specifications, retaining the power to stop work should it fail to so conform.

The architect formulated plans and specifications for the building of the gymnasium. The design provided that the roof be supported by 26 steel joists with a clear span of 100 feet. These joists were to be placed four feet apart and permanently attached to the walls of the building. The steel joists were to be connected to each other with eight lines of horizontal bridging. Diagonal

or cross bridging could have been specified instead of horizontal bridging.[1]

It was during the erection of these 26 joists that the collapse occurred, and this litigation ultimately followed.

Construction was commenced in the summer of 1967, and by August, 1967, three of the four walls of the gymnasium had been erected, with the fourth wall, the south, left open to facilitate the removal and entrance of heavy construction equipment.

In the week prior to August 7, 1967, plaintiff had taken three days to set the 26 roof joists called for by the plans on the bearing walls of the gymnasium in the approximate place of their permanent installation. All 26 joists were set on the walls consecutively starting from the north wall and proceeding parallel thereto at four foot intervals. When the first joist was set in place, it was tied to the north wall by four lines of horizontal bridging. After the first joist was attached to the north wall by the bridging, each successive joist was set in place next to it and connected with four lines of horizontal bridging until all the joists were positioned. The plans called for eight rather than four lines of bridging. No welding of the joists to the supporting walls or to the columns in the walls was done during this phase of the installation. The plans called for such welding to be done but did not specify when. The bridging was connected by bolts. Robert Schieffer, one of the plaintiffs, testified that he instructed his men to tighten these bolts

[1] A "line" of horizontal bridging consists of two pieces of structural steel, one fastened to the top of and at right angles to the roof joists and one similarly fastened to the bottom. The bridging would then run horizontally from the top of one joist to the top of the next, and from bottom to bottom.

Cross bridging—also called diagonal bridging—differs from horizontal bridging in that it ties the top cord of one joist to the bottom cord of the next joist rather than tieing top to top and bottom to bottom.

with wrenches. Whether these bolts were properly tightened or were subsequently loosened is disputed.

On the morning of the collapse, the crew had been instructed by Schieffer to make the final alignment of the joists, to install the remaining lines of bridging and to weld the joists to the support pillars and the supporting wall. This required the workers to exactly position the joists by use of clamps and pry boards and to loosen or remove some of the bridging that had previously been installed. While this work was in progress, and after eight of the joists had been welded in place, the remaining 18 joists collapsed and fell to the gymnasium floor, displacing parts of the walls as they fell.

The architect was continuously represented at the building site by Marty Halverson. Up until the day of the collapse, Halverson had not reported any defect or irregularity to the defendant.

*Issues.*

The following issues are dispositive of this appeal:

1. Was the failure of the defendant to use cross bridging rather than horizontal bridging negligence per se under the Wisconsin Administrative Code, IND 53.17?

2. Did the defendant breach a duty of reasonable care in designing the building with horizontal bridging rather than cross bridging?

3. Did the defendant have a duty to warn the plaintiff of possible construction hazards and, if so, was this duty violated by defendant?

4. Is the evidence sufficient to support a finding that the construction procedures used by plaintiff were the cause of the collapse?

5. Is this an action for contribution?

6. Did either plaintiff or defendant violate the rules for briefs before this court so that double costs should be imposed?

*Wisconsin Administrative Code.*

The plaintiff contends that it was error for the trial court to find that the defendant had not violated Wis. Adm. Code, IND 53.17 [2] when the plans it prepared provided for horizontal bridging rather than cross bridging.

Sec. IND 53.17 (6) (e) requires cross bridging. However, sec. 53.17 (2) (b) says the requirements for steel joist construction shall not apply when the spans and spacings defined in the section are exceeded, and it further provides that in such instances the provisions of sec. 53.16 are applicable. Several expert witnesses testified the steel joists in question exceeded the length of the spans subject to the applicable provisions of sec. 53.17. Therefore, the provisions of sec. 53.16 are applicable. It was their testimony that generally the steel joists regulated by the provisions of sec. 53.17, including the specific bridging requirements of sec. 53.17 (6) (e), were of a prefabricated nature and subject to standard specifications and load tables. However, longer spans generally required special design and were therefore subject only to the provisions of sec. 53.16.

This court has frequently held that great weight should be given to the administrative agency's interpretation and application of its own rules, unless plainly erroneous or inconsistent with the regulation so interpreted. *Josam Mfg. Co. v. State Board of Health* (1965), 26 Wis. 2d 587, 133 N. W. 2d 301. This is especially so in an area calling for special expertise.

In this case, the department of industry, labor & human relations had approved the plans. Also, the administrator of the industrial safety and building division of the ILHR department testified that sec. 53.17 (6) (e)

---

[2] All references to the Wis. Adm. Code are to the code that was in effect from the time of design through August 7, 1967, the date of the collapse. *See:* Wis. Adm. Code 1974 discarded pages.

was not applicable to steel joists which were as long as the ones specified in this building construction. Other expert witnesses supported this testimony. Similarly, there was expert testimony that the construction design in this case complied with the Manual of Steel Construction of the United States steel industry.[3]

Admittedly there is expert testimony which, to some extent, conflicted with testimony of other experts in regard to the applicability of the Wisconsin code and the industry manual. However, it cannot be said that the trial court erred in finding the defendant had not violated either of these codes.

*Common-law duty of reasonable care in design.*

The plaintiff asserts that even if the defendant did not violate the administrative code, the evidence established a common-law standard of care to use cross bridging for the particular steel joists used in this construction. Strong reliance is placed upon *Swaney v. Steel Co.* (1963), 259 N. C. 531, 131 S. E. 2d 601. We are of the opinion that plaintiff's reliance on *Swaney* is misplaced. There the fall was caused by a deficiency in the strength of the bolts connecting two struts of the truss at its apex. The court emphasized that the truss was of such a special and unusual design none of the testifying experts had seen anything like it before. This was coupled with the general lack of knowledge of the steel erector which would enable him to determine the strength or load capacity of the apex bolts. The defect, therefore, was latent and the designer was held to a duty to either design the truss so it could be lifted in the accepted manner or to instruct the workers as to the proper method of lifting it.

---

[3] *See:* Manual of Steel Construction (1967, 6th ed., 4th rev. printing), American Institute of Steel Construction, Inc.

In the present case, the testimony was sufficient to establish general knowledge in the industry of the special care required in installing horizontal bridging. Don Breed, an ironworker, testified that any careful steel erector would be sure to tie the first member with bridging to the end wall before proceeding to the next. Further, each successive member should be tied to the previous one. Paul Andersen, a practicing structural engineer and professor of structural engineering at the University of Minnesota, agreed that this step-by-step method of installation was the only safe method. Thus, unlike *Swaney,* the evidence in this case establishes that the procedures for erecting such joists and horizontal bridging were well known and not beyond the knowledge and ability of the ordinary steel erector.

On oral argument, the plaintiff directed our attention to the recent case of *A. E. Investment Corp. v. Link Builders, Inc.* (1974), 62 Wis. 2d 479, 214 N. W. 2d 764. We are of the opinion this case is readily distinguishable from the instant case and does not relate to the issue here presented.

The evidence in this case is sufficient to establish that the special precautions necessary when erecting long span joists with horizontal bridging are generally known in the steel erection industry. Further, the testimony of Professor Andersen, Orville Arnold, a consulting engineer, and Don Breed, was sufficient to establish that if correct erection procedures were followed, horizontal bridging was as safe as cross bridging. The trial court was correct in finding that defendant had not breached any common-law duty as to proper design.

*Duty to warn.*

Plaintiff next contends that even if defendant had no duty to use cross bridging rather than horizontal bridg-

ing, he had a duty to warn the plaintiff of the dangerous propensities of the steel joists and of any impropriety in the procedures of erection adopted by plaintiff. Again plaintiff relies on *Swaney, supra,* for the proposition that the designer has a duty to instruct the contractor as to proper erection procedures where the dangerous propensities of the joists are beyond the knowledge of the contractor. This is a proper statement of the rule in *Swaney,* but for the reasons given above, *Swaney* is inapplicable to the present case.

In the instant case, although plaintiff had never built a building with such a large roof span, it had built 50 or 60 steel structures some of which had floor or roof spans in excess of 50 feet. The people who did the erection, while not "card carrying" ironworkers, had twenty-five cumulative years of experience. Given this amount of expertise and the general knowledge in the industry concerning the propensities of steel joists and horizontal bridging, it would not be unwarranted to find that whatever danger existed was or should have been known to plaintiff and consequently defendant had no duty to warn as to the obvious hazard. The trial court so found.

In addition, there was ample evidence to support a finding that defendant's contract with the owner did not require the architect to specify the procedures for erection or to check the work of the contractor to be sure proper procedures were being followed.

The owner-architect contract provided in relevant part:

"3.4.2 To the extent provided by the contract between the Owner and the Contractor, he shall make decisions on all claims of the Owner and Contractor and on all other matters relating to the execution and progress of the work or the interpretation of the Contract Documents. He shall check and approve samples, schedules, shop drawings and other submissions only for conformance with the design concept of the Project and for

compliance with the information given by the Contract Documents, prepare change orders and assemble written guarantees required of the Contractors.

"3.4.3 *He will make periodic visits to the site to familiarize himself generally with the progress and quality of the work and to determine in general if the work is proceeding in accordance with the Contract Documents.* He will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the work and he will not be responsible for the Contractors' failure to carry out the construction work in accordance with the Contract Documents. During such visits and on the basis of his observations while at the site, he will keep the Owner informed of the progress of the work, will endeavor to guard the Owner against defects and deficiencies in the work of Contractors, and he may condemn work as failing to conform to the Contract Documents. . . ."

The contract does not make the defendant a supervisor of the project in the sense that he was responsible for the procedures adopted by the contractor. Defendant's obligations under the contract are primarily aimed at insuring the end product will comply with the plans and be of good workmanlike quality. This does not involve the safety of the procedures utilized.

The precise question was raised by the plaintiff in *Walker v. Wittenberg, Delony & Davidson, Inc.* (1966), 241 Ark. 525, 412 S. W. 2d 621, rehearing granted (1967), 242 Ark. 97, 412 S. W. 2d 621, 626. The court in that case, on rehearing, rejected plaintiff's contention that the architect was to be a supervisor to the extent of insuring safe procedures were followed by the contractor. *Walker, supra,* 242 Ark. 102, 103, 106. Although the court had no written contract, it relied upon the language of the standard American Institute of Architects contract which contains provisions similar to the contract in question. To hold otherwise would make the architect the general safety supervisor at the site, a job which

would require his continuous presence in disregard of the express language of his contract. In addition, it would fundamentally alter the relationship between the owner, architect and contractor in a way not envisioned by the parties themselves. The mere fact that defendant in this case was continuously represented on the site by Halverson cannot, as is suggested by plaintiff, alter the lack of a legal duty to interfere with the contractor's judgment as to procedure, absent a showing that the risks were so unusual as to be beyond the ability of the contractor to perceive, given his special knowledge and experience.

## Sufficiency of evidence.

Plaintiff asserts that the great weight and clear preponderance of the evidence proves that the failure of the defendant to specify cross bridging rather than horizontal bridging was the cause of the collapse, not the construction procedures adopted by the plaintiff. In the alternative, plaintiff asserts that if the procedures are found to be the cause of the collapse, then of necessity the failure of the defendant to warn plaintiff of the defective procedures was a concurring and substantial cause.

The undisputed testimony at trial, conceded by plaintiff in his brief, was that if a joist was left without lateral support from bridging for a length of 41 feet, the joist would buckle from its own weight. The testimony of Schieffer established that as of the Friday before the collapse, four lines of bridging had been installed and fastened. Orville Arnold, based on his inspection of the site after the collapse and a study of the plans, testified that these four lines of bridging would have been 24 feet and 36 feet apart. Arnold further testified that removal of any one of these lines of bridging would have created a gap in excess of 44 feet which would

cause the joist to buckle and fall. On the day of the collapse, Schieffer had directed his men to align the joists for final fastening. This required moving the joists laterally with pry boards and clamps and removing or loosening some of the bridging which had previously been installed.

Three witnesses testified that based on their inspections after the collapse, some of the bridging had been removed and some others either had missing bolts or loose bolts. Of the three, Arnold and Carl Roesser, a consulting engineer called by the plaintiff, made their inspections some three weeks after the collapse. Burt Stevens, one of the defendants, made his within two days of the collapse. Despite the length of time between the collapse and the inspections by Arnold and Roesser, Roesser noted in his written report that he was told by plaintiff Schieffer that everything was in the same condition that it had been immediately after the collapse. Arnold also testified that he was advised by the contractor that no changes had been made to the remaining joists since the date of collapse.

In regard to this last testimony, plaintiff maintains in his brief that these opinions concerning removal of bridging are merely assumptions on the part of the witnesses who were not there at or near to the time of the collapse. Plaintiff cites *Hicks v. New York Fire Ins. Co.* (1954), 266 Wis. 186, 63 N. W. 2d 59, for the proposition that any expert opinion as to cause based on such assumptions cannot alone support a finding on causation. Plaintiff further maintains that having once established that four lines of bridging were installed, this condition must be presumed to continue to exist absent evidence to the contrary, citing *Bruss v. Milwaukee Sporting Goods Co.* (1967), 34 Wis. 2d 688, 150 N. W. 2d 337.

The *Bruss Case* is not in point. The plaintiff, Robert B. Schieffer, himself testified that it was necessary to remove or loosen some of the previously installed bridg-

ing to align the joists. He also stated to Roesser and Arnold that nothing had been changed as of their inspections, yet both witnesses saw bridging which had been removed.

The *Hicks Case* is also not in point as this court merely held that an expert's opinion which was based on three assumptions would not sustain a finding of cause where no evidence was presented to show that any of the assumed conditions existed either before or after the incident in question. *Hicks, supra,* 189. In this case the expert witnesses were basing their opinions and testimony on what they were told and actually observed.

It was undisputed that no welding was done on the joists until the morning of the collapse, at which time eight of the 26 joists had been welded. These same eight joists were the only ones which did not fall.

Expert testimony as to the cause of the collapse was given by four engineers who were relatively independent of the parties. Lawrence Peterson stated that the cause was a rotation of the joists due to the use of horizontal rather than cross bridging. On the other hand, Roesser, Professor Andersen, and Arnold all opined that the collapse was caused by the faulty erection procedures, *i.e.*, only putting up four lines of bridging and thereafter removing or loosening some, leaving a joist laterally unsupported for more than 41 feet, plus failing to weld the joists in place. Arnold further added that with the number of bridging pieces removed or unattached that he found on his inspection, it would have made no difference whether cross or horizontal bridging had been used, the joists would have collapsed in either case.

Professor Andersen and Don Breed both testified as to what, in their opinion, was the only safe way to install these joists with horizontal bridging. Starting from the north wall, the first joist should have been held in place

by the crane until all eight lines of bridging had been connected to the wall and the joist welded in place. Then the next joist should be similarly installed, connecting it by all eight lines of bridging to the first. In this way, each joist would be supported by the crane until fully stabilized and fastened.

Plaintiff contends that Wis. Adm. Code, IND 53.16 (11) (d), pp. 69, 80 effectively prohibits it from having used this method. That subsection provides:

"(d) *Alignment.* No riveting, permanent bolting or welding shall be done until as much of the structure as will be stiffened thereby has been properly aligned."

It does not appear that any other portion of the structure concerned would be stiffened by the welding of these joists, and no evidence was introduced concerning this regulation. In addition, plaintiff appears to have overlooked the apparent clear mandate of sub. (11) (c) of that same section, which provides:

"(c) *Adequacy of temporary connections.* As erection progresses, the work shall be securely bolted, or welded, to take care of all dead load, wind and erection stresses." Wis. Adm. Code, p. 79.

Although in some respects there was conflicting testimony as to the cause of the collapse, the weight of the testimony and the credibility of witnesses are matters within the province of the trial court as the trier of fact. *Valiga v. National Food Co.* (1973), 58 Wis. 2d 232, 244, 206 N. W. 2d 377. Upon review of the record, we find that the finding of the trial court that the faulty procedures adopted by the plaintiff were the sole cause of the collapse is not contrary to the great weight and clear preponderance of the evidence. *Milbauer v. Transport Employes' Mut. Benefit Society* (1973), 56 Wis. 2d 860, 203 N. W. 2d 135.

*Action for contribution.*

The defendant takes the position that because the plaintiff did not plead an action for contribution, he may not raise this issue for the first time on appeal. This, of course, is a correct statement of the general rule. *Berger v. Metropolitan Sewerage Comm.* (1973), 56 Wis. 2d 741, 203 N. W. 2d 87. However, this is not precisely the situation presented in the instant case.

In *Luckett v. Cowser* (1968), 39 Wis. 2d 224, 159 N. W. 2d 94, it was determined that an issue was fully presented to the trial court when the trial court requested briefs thereon and the opinion reflected that the issue was considered.

In this case the record contains correspondence from the trial court which demonstrates that the issue of contribution was brought to his attention by the trial briefs filed by the parties. The record also reflects that he gave the issue consideration but determined that it was not necessary for him to rule thereon because he found the plaintiff fully responsible. Since we affirm the decision of the trial court, it likewise is unnecessary for us to further consider the issue of contribution.

*Double costs.*

The defendant asserts that the briefs of the plaintiff have not complied with sec. 251.34 (5), Stats., in that the plaintiff's abridgment of the testimony is not sufficiently complete to allow consideration of the issues. The defendant found it necessary to print a supplemental appendix and asks that the appeal be dismissed without a hearing, or that double costs plus the cost of printing the supplemental appendix be imposed.

It is apparent that we have declined to dismiss the appeal without a hearing.

In *Nothem v. Berenschot* (1958), 3 Wis. 2d 585, 590, 89 N. W. 2d 289, this court stated the requirements governing the abridgment of testimony:

". . . The appendix attached to appellant's brief is inadequate in failing to set forth material testimony tending to sustain the verdict. Rule 6 (5) (c) of this court requires that the appendix contain an abridgment of so much of the bill of exceptions as is necessary and material to a consideration of the questions involved, and contemplates that such abridgment shall contain not only the testimony favorable to appellant's contentions, but also that tending to support the verdict on the points in controversy. . . ."

Further, this court has held that the filing of a supplemental abridgment by the respondent does not relieve the appellant of his duty under the court rule. *Martinson v. Brooks Equipment Leasing, Inc.* (1967), 36 Wis. 2d 209, 152 N. W. 2d 849, rehearing denied, 36 Wis. 2d 209, 154 N. W. 2d 353. Finally, both *Nothem* and *Martinson* indicate that double costs may be awarded for such a violation, while *Martin v. Martin* (1970), 46 Wis. 2d 218, 174 N. W. 2d 468, indicates that affirmance without opinion is an appropriate remedy where the errors are numerous and substantial.

A review of the testimony abridged by the defendant reflects that the scope of the omissions in the abridgment by the plaintiff were considerable. Where, as here, it is necessary for this court to determine whether the findings of the trial court were against the great weight and clear preponderance of the evidence, the abridgment should present a fair, accurate and complete statement of the testimony. Much of the testimony omitted in the appendix of the plaintiff was the testimony relied upon by the trial court in reaching its decision. The defendant is awarded double costs plus the costs of printing the supplemental appendix.

The plaintiff asks that the defendant's brief be stricken with reversal of the findings of the trial court or a new trial plus double costs. We find no merit to this motion, and it is denied.

*By the Court.*—Judgment affirmed with costs awarded to the respondent as provided in the opinion.