HOLTZ & KRAUSE, INC., Respondent and Cross-Appellant, v. DEPARTMENT OF NATURAL RESOURCES, Appellant and Cross-Respondent: PESHEK, Public Intervenor, Appellant and Cross-Respondent. [Case No. 77–668.]†

CITY OF WAUSAU, Respondent and Cross-Appellant, v. DEPARTMENT OF NATURAL RESOURCES, Appellant and Cross-Respondent: PESHEK, Public Intervenor, Appellant and Cross-Respondent. [Case No. 77–669.]†

Supreme Court

Nos. 77–668, 77–669. Argued September 5, 1978.—
Decided October 3, 1978.
(Also reported in 270 N.W.2d 409.)

† Motions for reconsideration denied, without costs, on November 28, 1978.

For Department of Natural Resources there were briefs by *Patrick Walsh,* assistant attorney general, and *Bronson C. La Follette,* attorney general.

For the Public Intervenor there were briefs and oral argument by *Peter A. Peshek.*

For Holtz & Krause, Inc., there were briefs by *James P. Lonsdorf* and *Timken, Lonsdorf & Mallery, S.C.,* and oral argument by *James P. Lonsdorf,* all of Wausau.

For City of Wausau there were briefs by *Earl Munson, Jr., Timothy J. Muldowney* and *La Follette, Sinykin, Anderson & Munson,* attorneys, of Madison, and *James A. Simmonds,* Wausau city attorney, of counsel, with oral argument by *Earl Munson, Jr.*

CALLOW, J. These appeals and cross-appeals are from a judgment affirming in part and reversing in part a Department of Natural Resources (DNR) order prescribing a schedule for the abandonment of the Holtz & Krause, Inc., solid waste disposal landfill. The circuit court determined that there was substantial evidence supporting the DNR's finding that the landfill was having a detrimental effect on ground and surface water. The court remanded the case to the DNR for further evidence on the question of an abandonment time schedule, directing the agency to consider administrative and judicial delays and the economic problems incident to the landfill's closure.

Since 1957 Holtz & Krause, Inc., has owned and operated a solid waste disposal landfill in the city of Wausau. The DNR licensed the site as a sanitary landfill in 1969 and continued to license the site through 1976–1977. A sanitary landfill is an engineered solid waste disposal facility where waste is compacted and covered daily.

The Holtz & Krause 57.8 acre landfill site is authorized by its license to receive refuse, garbage, noncombustible waste, demolition material, and wood matter. The site receives about 60 percent of the solid waste generated in Marathon County. It serves a population of about 60,000 from three cities, including Wausau, and from several towns and villages. Within a thousand feet of the south and west boundaries of the landfill are three sloughs con-

nected to the Eau Claire flowage. The sloughs are shallow, stagnant, and have a high level of eutrophication. The DNR determined, and it is not contested on appeal, that the sloughs are all navigable waters.

In 1969 the DNR became aware that leachate from the landfill site was seeping into adjoining waters. Leachate is water that has become contaminated as a result of percolating through solid waste.

In response to a DNR order of November, 1972, Holtz & Krauses's consultants submitted a report in September, 1974, calling for a detailed engineering study and periodic water sampling. Holtz & Krause engaged an engineering firm to perform a study in the fall of 1974. In February, 1975, the DNR ordered Holtz & Krause to submit by July 1, 1975, either a plan for complete abandonment by, or continued use after, August 1, 1976. The Holtz & Krause engineering consultants worked with the DNR over the course of the next several months. In December, 1975, they submitted a comprehensive report.

In November, 1976, the DNR ordered Holtz & Krause to submit by January 1, 1977, a plan for the abandonment of the landfill site by July 1, 1978. On November 10, 1976, Holtz & Krause requested a public hearing to review the order, pursuant to sec. 144.35(1)(a), Stats. An eight-day hearing took place during March through May of 1977. The DNR, Holtz & Krause, the public intervenor (*See:* sec. 165.07, Stats.), the city of Wausau (hereinafter the City), and the town of Rib Mountain made appearances at the hearing.

On August 2, 1977, the DNR entered another abandonment order requiring Holtz & Krause to submit by October 1, 1977, a plan for the abandonment of the landfill site. The DNR was to review the plan by November 1, 1977, and the site was to be abandoned by August 1, 1978. The order was based on the examiner's findings that the landfill was within 1,000 feet of the sloughs and that it "has had" and "may have a detrimental effect" on ground and surface water. Wis. Adm. Code sec. NR

151.12(4)(a) prohibits landfill operations within 1,000 feet of any navigable lake, pond, or flowage. Wis. Adm. Code secs. NR 151.12(4)(c) and (d) prohibits such operations if the DNR finds that leaching from solid waste may have a detrimental effect on ground or surface water quality. The examiner found that Holtz & Krause could abandon the landfill by August 1, 1978, in an environmentally acceptable manner and that alternative sites or methods of solid waste disposal could be available by that date. It found the August 1, 1978, deadline reasonable because, notwithstanding the multiple orders by the DNR requiring Holtz & Krause to pursue a course of action to control ground and surface water contamination or close the site, the company had not attempted to accrue funds in anticipation of the substantial capital outlay incident to abandonment and closure.

Holtz & Krause and the City petitioned the circuit court for Marathon County for judicial review pursuant to secs. 227.15–227.20, Stats. The circuit court consolidated the actions and stayed the enforcement of the order pending review.

On December 29, 1977, the court decided that there was sufficient evidence on which to base a finding that the landfill was having a detrimental effect on ground and surface waters. The court remanded the case to the DNR for further evidence on the question of a schedule for abandonment in light of administrative and judicial delays and economic implications of abandonment. The court signed a judgment to that effect on January 19, 1978.

The DNR and the public intervenor appeal from that part of the judgment remanding the matter to the DNR; Holtz & Krause and the City cross-appeal from that part affirming the remainder of the order. The parties have raised the following questions:

(1) Was there substantial evidence to support the findings of fact on which the abandonment order was based?

(2) Was the abandonment order properly based on Wis. Adm. Code sec. NR 151.12(4) (a) ?

(a) Did the DNR incorrectly interpret that rule?

(b) Was the DNR barred from enforcing the rule because of past agency practice?

(3) Are Wis. Adm. Code secs. NR 151.12(4) (c) and (d) unconstitutionally vague?

(4) Are Wis. Adm. Code secs. NR 151.12(4) (c) and (d) beyond the scope of the agency's statutory authority?

(5) Was the DNR required to prepare an environmental impact statement before issuing the abandonment order?

(6) Did that part of the circuit court judgment, remanding the case to the DNR for further evidence to support the schedule for abandonment, violate the public trust doctrine, Wis. Const. art. IX, sec. 1?

We hold that the DNR properly based its order on the 1,000-foot rule, Wis. Adm. Code sec. NR 151.12(4) (a) ; that the abandonment schedule was supported by substantial evidence; and that the DNR was not required to prepare an environmental impact statement in connection with the abandonment order. Our holding obviates an inquiry into the validity and application of the rules proscribing landfill sites where the DNR finds that leaching may have a detrimental effect on ground and surface waters. We also do not reach the question of the application of the public trust doctrine.

(I)

The DNR and public intervenor argue that, contrary to the conclusion of the circuit court, there was substan-

tial evidence on which to base the findings (a) that Holtz & Krause could abandon the site in an environmentally acceptable manner by August 1, 1978, (b) that an alternative site or means of waste disposal could be found by August 1, 1978, and (c) that the deadline was reasonable because notwithstanding the multiple DNR orders Holtz & Krause had failed to accrue the substantial funds necessary to accomplish abandonment.

An agency's finding of fact will not be upset on judicial review unless it is unsupported by substantial evidence in the record; the reviewing court will not independently weigh the evidence or pass on the credibility of witnesses. Sec. 227.20 (6), Stats.; *City of Superior v. ILHR Department,* 84 Wis.2d 663, 666, 267 N.W.2d 637 (1978). This standard does not permit a court to overturn an agency's finding even if it may be against the great weight and clear preponderance of the evidence. *Gateway City Transfer Co. v. Public Service Comm.,* 253 Wis. 397, 34 N.W.2d 238 (1948).

The substantial evidence test:

" 'should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside.' " [Citation omitted.] *Copland v. Department of Taxation,* 16 Wis.2d 543, 554, 114 N.W.2d 858 (1962). [Emphasis in original.]

Robert Glebs, an environmental engineer in training in the solid waste section of DNR, testified that an environmentally sound abandonment plan would necessarily include surface grading for surface water drainage,

controlling sedimentation and erosion, and placing a clay cap over the top to limit water infiltration. A leachate collection system might also be necessary.

Mr. Glebs calculated that roughly 240,000 cubic yards of fill would be required to form acceptable final contours. Based on the incoming amount of waste, the final contours could be formed in less than a year. He testified that it would require about nine months for Holtz & Krause to submit a plan, have it approved by the DNR, and abandon the site according to the plan. Mr. Glebs testified he had reviewed and approved several abandonment plans but had never drawn one.

William Krause, president of Holtz & Krause, testified that the corporation's net worth was $85,000. The testimony of a consulting engineer showed that the cost of a clay cap might be between a half million and a million dollars; the cost of a leachate control system, another million dollars. Mr. Krause testified that the corporation would have to declare bankruptcy if the order were carried out. It would be impossible for Holtz & Krause to finance an abandonment within the time prescribed by the order.

As the DNR engineer assigned to the Marathon County solid waste disposal system, Mr. Glebs testified to an awareness of the county's effort to find an alternative site to serve the users of the Holz & Krause landfill. He had implemented about ten or twelve county plans elsewhere in the state. He testified that of three potential sites one appeared suitable. He thought a new site would be available by mid-1978.

David Martin, North Central District solid waste management coordinator for the DNR, testified that in order to open a new landfill there must be hydrogeological feasibility studies, development and approval of an engineering plan, construction, and inspection by the DNR. He noted that it was difficult to find a site in eastern Marathon County because of high bedrock and ground-

water levels. Nonetheless, he believed it was feasible to have an alternative site operating by mid-1978.

A member of the Marathon County Solid Waste Management Board, charged with finding a new disposal site, testified that an ideal date to begin a new county landfill would be August 1, 1979. The earliest date projected by the Board's staff was in the fall of 1978, however. According to the Board member, the Board was behind schedule and did not have the funds it would need to complete the project.

On its review of the evidence, the circuit court determined that the agency, in setting its timetable, ignored administrative and judicial delays. As the court noted, however, that was the reason for its stay of the agency order. Sec. 227.17, Stats., authorizes a reviewing court to issue such a stay; the circuit court's order granting a stay is not assigned as error on this appeal. The court's issuance of a stay provided protection for the petitioners during the judicial review process.

The circuit court found Mr. Glebs' testimony wanting because he did not adequately describe various tests that he had carried out. He had not participated in any abandonment and was able to recall only five closings of landfills of this size. This evaluation of Mr. Glebs' testimony exceeded the permissible bounds of a reviewing court's inquiry. The weight and credibility assigned to Mr. Glebs' testimony are for the agency to decide.

The court also determined that the DNR finding that the landfill could be abandoned in an environmentally acceptable manner by August 1, 1978, was not supported by substantial evidence in light of testimony showing that Holtz & Krause could not afford to carry out an abandonment plan. It is undisputed that it would be impossible for Holtz & Krause to finance an acceptable abandonment plan within a year. Mr. Glebs' testimony amply established the technical feasibility of abandon-

ment by that date. Whether the DNR's finding is supportable thus turns on the extent to which it must take into account the economic circumstances of the operator in ordering the abandonment of a landfill.

This is an enforcement proceeding under sec. 144.35, Stats. That section authorizes the DNR to "order that necessary corrective action be taken within a reasonable time." Sec. 144.35(1)(a), Stats. After a hearing, the DNR may affirm, modify, or rescind such an order, or issue "an appropriate order for the prevention, abatement or control of the problems involved or for the taking of such other corrective action as may be appropriate." Sec. 144.35(1)(b), Stats. An order may prescribe dates by which the necessary action shall be taken. *Id.*

The prescribed standards of reasonableness and appropriateness suggest that the order should be tailored to the circumstances of the problem. These elastic terms must be considered in light of the policy underlying Chapter 144, Stats. *See: State ex rel. Arnold v. County Court,* 51 Wis.2d 434, 439–40, 187 N.W.2d 354 (1971).

Sec. 144.025, Stats., states:[1]

---

[1] Secs. 144.30 to 144.46, Stats., were created by Chapter 83, Laws of 1967. The legislature's statement of policy, published in the session laws but not reproduced in the Wisconsin statutes, reads as follows:

"SECTION 1. STATEMENT OF POLICY AND PURPOSES. (1) The high level of production required to meet the varied needs of an expanding population and high standard of living has resulted in a sharp rise in the amount of waste materials discarded annually.

"(2) Inefficient and improper methods of waste disposal have caused an ever increasing pollution of our vital air, land and water resources threatening the utility of our resources and the quality of the environment in which we live. The problems of waste disposal endanger the public health, safety and welfare, create public nuisances, result in scenic blight and adversely affect land values.

"(3) The close interrelationship of air, land and water pollution requires concerted action to prevent the worsening of these prob-

"(1) Statement of Policy and Purpose. The department of natural resources shall serve as the central unit of state government to protect, maintain and improve the quality and management of the waters of the state, ground and surface, public and private. Continued pollution of the waters of the state has aroused widespread public concern. It endangers public health and threatens the general welfare. A comprehensive action program directed at all present and potential sources of water pollution whether home, farm, recreational, municipal, industrial or commercial is needed to protect human life and health, fish and aquatic life, scenic and ecological values and domestic, municipal, recreational, industrial, agricultural and other uses of water. . . . To the end that these vital purposes may be accomplished, this act and all rules and orders promulgated pursuant thereto shall be liberally construed in favor of the policy objectives set forth in this act."

The question whether the time period prescribed is reasonable and the order appropriate must be resolved in light of the legislative finding as to the dangers of pollution and the need for a "comprehensive action program directed at all present and potential sources of water pollution." The DNR's ability to meet the evil at which

lems. A problem in solid waste disposal will not be solved by creating air pollution, nor will a problem in air pollution be solved by intensifying the problems of water pollution. Immediate remedial action is needed to protect our valuable resources.

"(4) It is the purpose of this act to grant the necessary powers to organize a comprehensive program to enhance the quality, management and protection of the state's air and land resources. Recognizing the need for a co-ordinated effort to prevent and abate all kinds of environmental pollution, it is the intention of this act to vest authority for the state-wide control of air pollution and solid waste disposal in the same state agency which has general supervision and control over the waters of the state.

"(5) In order to achieve the policy objectives of this act, it is the express policy of the state to mobilize governmental effort and resources at all levels, allocating such effort and resources to attain the maximum benefit for the people of the state as a whole."

the legislation is directed must not be frustrated by the polluter's net worth. Here the agency specifically found that Holtz & Krause failed to set aside funds to finance abandonment despite its awareness over the years of problems caused by the site's location. The abandonment schedule was therefore consonant with legislative policy and reasonably based on the company's lack of responsiveness to earlier DNR orders. A reviewing court should defer to an agency's application of a statute to found facts where the agency has particular expertise and the interpretation has a rational basis and "does not conflict with the statute's legislative history, prior decisions of this court, or constitutional prohibitions." *Pabst v. Department of Taxation*, 19 Wis.2d 313, 323–24, 120 N.W.2d 77 (1963); *see also: Milwaukee v. Wisconsin Employment Relations Comm.*, 43 Wis.2d 596, 168 N.W. 2d 809 (1969).

We conclude that there was substantial evidence on which to base the findings supporting the abandonment schedule.

### (II)

Wis. Adm. Code sec. NR 151.12 (4) (a) proscribes landfill operations within 1,000 feet of navigable waters. The DNR found that the sloughs were navigable in fact and that the Holtz & Krause site was within 1,000 feet of the sloughs. The record contains a contour map with markings made by Mr. Glebs showing that much of the landfill is within 1,000 feet of the sloughs. Part of the landfill is not within 1,000 feet of the sloughs.

The DNR order rests on this provision and on the rules prohibiting landfill operations where the DNR finds that they may have a detrimental effect on ground or surface water. The circuit court did not reach the

question of the application of the 1,000-foot rule, since it affirmed the agency's finding that the landfill may have a detrimental effect on the waters. On appeal, the City urges that the DNR may not properly base its order on the 1,000-foot provision because of its past failure to enforce the rule. Even if the rule may appropriately be invoked, the City maintains it does not permit an order of abandonment of the entire landfill but only those parts within 1,000 feet of the sloughs. We disagree with both contentions.

Sec. 227.20 (8), Stats., provides:

"The court shall reverse or remand the case to the agency if it finds that the agency's exercise of discretion . . . is inconsistent with an agency rule, an officially stated agency policy or a prior agency practice, if deviation therefrom is not explained to the satisfaction of the court by the agency; . . . but the court shall not substitute its judgment for that of the agency on an issue of discretion."

The City rests its contention that the DNR may not here invoke the 1,000-foot provision on the past failure to enforce the provision with respect to Holtz & Krause and on a continuing failure to enforce the provision throughout the state.

The City brings the facts supporting the statewide pattern of nonenforcement before this court by motion asking the court to take judicial notice of the agency's failure to enforce the rule without making formal exemption in several hundred cases. We decline to take judicial notice of these facts first offered on appeal. They were not presented to the agency and reviewed in the circuit court. Chapter 227, Stats., contemplates judicial review upon the record; there is ordinarily no trial de novo in the circuit court. *Wisconsin's Environmental Decade v. Public Service Comm.*, 79 Wis.2d 161, 170, 255 N.W.2d 917 (1977). The court may consider facts outside the

record before the agency only in cases of alleged irregularities in procedure. Sec. 227.20(1), Stats.

Our review is thus narrowed to the question whether the agency's past failure to enforce Wis. Adm. Code sec. NR 151.12(4)(a) against Holtz & Krause bars its resting the abandonment order on the rule. The City urges this court to find that the DNR's licensing and then granting Holtz & Krause the option of continued use conditioned upon presentation of an acceptable plan constitute an agency practice of seven years of nonenforcement of the 1,000-foot rule which has not been satisfactorily explained to the court.

The City relies on sec. 227.20(8), Stats., created by Chapter 414, Laws of 1975. The Legislative Council Note to sec. 25 of Chapter 414 indicates that the new language created by sec. 25 is intended to "state more clearly what seems to be intended in the more traditional language" and to provide greater analytic clarity to the process of judicial review. The applicable traditional standard, embodied in sec. 227.20(1)(e), Stats. 1973, which was repealed in 1976, provided for reversal of an administrative decision where the action was arbitrary and capricious and prejudiced the appellant's substantial rights. We cannot conclude that the agency's abandonment order is an action which is the result of an unconsidered, irrational choice. *See: Robertson Transportation Co., Inc. v. Public Service Comm.,* 39 Wis.2d 653, 661, 159 N.W.2d 636 (1968), and cases cited therein.

The City's characterization of the offered alternative of continued use under an acceptable plan as a "cruel hoax" is not borne out by the record. The agency was willing to permit continued operation only if appropriate environmental precautions were taken. The DNR gave Holtz & Krause an alternative less severe than abandonment if Holtz & Krause could demonstrate its adequacy. After considering extensive evidence including reports

prepared by the Holtz & Krause consultants, the agency concluded that the landfill must be closed. This decision was supported by carefully articulated findings of fact.

While the City is careful to say that its argument is not based on estoppel, the policy considerations involved in the application of estoppel to administrative action provide an appropriate perspective to guide the judicial implementation of sec. 227.20(8), Stats. A pattern of nonenforcement of health or safety regulations will not estop an agency from enforcing the regulations in the exercise of its police power. *Park Building Corp. v. Industrial Comm.*, 9 Wis.2d 78, 87–88, 100 N.W.2d 571 (1960). Involved are two competing concerns: preventing arbitrary or unfair agency action which causes injury as a result of justified reliance upon a past course of regulatory conduct, while permitting the unhampered, legitimate exercise of the police power.

The balance of these two legitimate concerns weighs in favor of permitting the DNR to order the abandonment of the Holtz & Krause landfill despite its earlier nonenforcement of the 1,000-foot rule and its alternative proposal of continued use under an acceptable plan. This abandonment order was an appropriate exercise of the DNR's discretion and will not be disturbed on review.

The DNR correctly applied this rule in ordering the abandonment of the entire landfill. The City's argument that the rule authorizes closure of only those parts of the landfill within 1,000 feet of the sloughs is superficially appealing but makes no sense in view of the manifest purpose of the rule: establishing a minimum setback from waters to enable a degree of attenuation of the leachate by natural soils. Where the lateral barrier between the landfill operations and the waters is additional solid waste rather than natural soils, the purpose of the 1,000-foot rule is frustrated. Holtz & Krause and the City

have not shown that the contemplated 1,000 feet of natural soils remain between the operating area and the sloughs. The DNR's construction and application of the rule to require abandonment of the entire site is reasonable and will not be upset here. *Vonasek v. Hirsch & Stevens, Inc.*, 65 Wis.2d 1, 7–8, 221 N.W.2d 815 (1974).

### (III)

The City argues that the abandonment order is invalid and must be remanded to the agency because the DNR failed to prepare an environmental impact statement (EIS) before issuing the order. The Wisconsin Environmental Policy Act (WEPA), sec. 1.11, Stats., requires that "to the fullest extent possible," all state agencies shall prepare a detailed EIS on "proposals for legislation and other major actions significantly affecting the quality of the human environment."[2] The City urges that an

---

[2] Sec. 1.11(2), Stats., reads as follows:

"(2) All agencies of the state shall:

"(c) Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the human environment, a detailed statement, substantially following the guidelines issued by the United States council on environmental quality under P.L. 91–190, 42 U.S.C. 4331, by the responsible official on:

"1. The environmental impact of the proposed action;

"2. Any adverse environmental effects which cannot be avoided should the proposal be implemented;

"3. Alternatives to the proposed action;

"4. The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

"5. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

"6. Such statement shall also contain details of the beneficial aspects of the proposed project, both short term and long term, and the economic advantages and disadvantages of the proposal.

"(d) Prior to making any detailed statement, the responsible

EIS is required by: (1) the language of sec. 1.11, Stats.; (2) Wis. Adm. Code, Chapter 150; and (3) the Governor's Guidelines embodied in Executive Order No. 26.

The DNR maintains that the hearings were the functional equivalent of an EIS and that the provisions of sec. 147.30, Stats.,[3] exempt the DNR from the EIS requirement in connection with orders of this type. The public intervenor urges the court to avoid deciding the question of the application of sec. 147.30 to an order issued pursuant to Chapter 144, Stats., but to fashion a narrow exemption for this case.

official shall consult with and obtain the comments of any agency which has jurisdiction or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate agencies, which are authorized to develop and enforce environmental standards shall be made available to the governor, the department of natural resources and to the public. Every proposal other than for legislation shall receive a public hearing before a final decision is made. Holding a public hearing as required by another statute fulfills this section. If no public hearing is otherwise required, the responsible agency shall hold the hearing in the area affected. Notice of the hearing shall be given by publishing a class 1 notice, under ch. 985, at least 15 days prior to the hearing in a newspaper covering the affected area. If the proposal has state-wide significance, notice shall be published in the official state newspaper;

"(e) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

"(h) Initiate and utilize ecological information in the planning and development of resource-oriented projects."

[3] "147.30 **Environmental pollution.** Regulatory actions taken by the department to eliminate or control environmental pollution shall be exempt from the provisions of s. 1.11, other than:

"(1) Involvement in federal financial assistance grants for the construction of publicly owned treatment works;

"(2) Financial assistance under s. 144.21; and

"(3) Issuance of permits or approvals for new sources of environmental pollution."

The circuit court found an EIS superfluous in this proceeding. We agree. Because we decide that the scope of the DNR's inquiry, as an environmental regulatory agency acting in that capacity, was comprehensive enough to constitute the functional equivalent of a formal EIS, we need not reach the question whether sec. 147.30, Stats., constitutes a broad exception for all agency actions taken under Chapter 144.

Federal courts confronted with the question whether the Environmental Protection Agency (EPA) is exempt from NEPA's[4] impact statement requirement have carefully fashioned an exception for EPA regulatory activities providing the "functional equivalent" of an EIS.

In *Portland Cement Association v. Ruckelshaus,* 486 F.2d 375, 384 (D. C. Cir. 1973), petitioner challenged the EPA's promulgation of cement plant stationary source standards under a provision of the Clean Air Act, 42 U.S.C. sec. 1857c–6 (1970). The court noted that there is a serious question whether NEPA applies to environmentally protective regulatory agencies. The court reviewed NEPA's legislative history, concluding that it was indecisive. *Id.* at 383. It expressed the competing policies as follows:

"The policy thrust toward exemption of the environmental agency is discernible from these factors, taken in combination: (1) An exemption from NEPA is supportable on the basis that this best serves the objective of protecting the environment which is the purpose of NEPA. (2) This comes about because NEPA operates, in protection of the environment, by a broadly applicable measure that only provides a first step. The goal of protecting the environment requires more than NEPA provides, i.e. specific assignment of duties to protection

---

[4] The provisions of WEPA were patterned after those of the National Environmental Policy Act (NEPA), 42 U.S.C. sec. 4321 et seq. (1970). *See: Wisconsin Environmental Decade v. Public Service Comm.,* 79 Wis.2d 409, 414, 256 N.W.2d 149 (1977).

agencies, in certain areas identified by Congress as requiring extra protection. (3) The need in those areas for unusually expeditious decision would be thwarted by a NEPA impact statement requirement. (4) An impact statement requirement presents the danger that opponents of environmental protection would use the issue of compliance with any impact statement requirement as a tactic of litigation and delay.

"The policies against a NEPA exemption embrace the endemic question of 'Who shall police the police'? As Senator Jackson stated, 'It cannot be assumed that EPA will always be the good guy.' Concern was also voiced by petitioners in this case that EPA might wear blinders when promulgating standards protecting one resource as to effects on other resources, as is asserted in this case, that air standards may increase water pollution. Finally, it is argued that a NEPA statement's procedures, though burdensome, allow for needed input by other federal agencies and simultaneously open up the decision-making process to scrutiny by the public." [Footnotes omitted.] *Id.* at 383–84.

Declining to shape a broad exemption for EPA actions, the court said that the provisions of the Clean Air Act provided the functional equivalent of NEPA compliance. The Clean Air Act requires the EPA to accompany a proposed standard with a statement of environmental concerns, pro and con. There is opportunity for public comment and judicial review. The court concluded that, while the rule-making process may not carry with it the full advantages of the "structured determinations of NEPA," it does strike a workable balance in that it avoids delay in carrying out the Clean Air Act while permitting other agencies to comment on the proposed rules. *Id.* at 384–86.

The court amplified its *Portland Cement* holding in *Environmental Defense Fund, Inc. v. Environmental Protection Agency*, 489 F.2d 1247, 1256 (D. C. Cir. 1973). That case involved a petition for review of an EPA order canceling almost all registrations for the use of DDT.

The court noted that the substantive standard established by the act under which the order was issued [the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. secs. 135–135k (1970)] "places great emphasis on the quality of man's environment." The procedural standards provide "full opportunity for thorough consideration of the environmental issues, and for ample judicial review." In that particular case, the court was satisfied that the lengthy hearings (seven months), during which public comment was solicited and "a wide scope of environmental aspects were considered," satisfied the functional equivalency concept of *Portland Cement.*

The court concluded:

"When it is clear that the NEPA objections are being raised by parties who have had ample opportunity to express their views, when there has been functional compliance, the *Portland Cement* rationale should certainly apply, and the agency action should be exempted from the strict letter of NEPA requirements. As we wrote recently, 'To require a "statement," in addition to a decision setting forth the same considerations would be a legalism carried to the extreme.' "

This approach has generally been followed by the federal courts considering the issue.[5] We deem it appropriate here.

The DNR is charged with the protection of the state's environmental resources. Chapter 144, Stats., *passim.* The department promulgated rules on solid waste man-

---

[5] *State of Wyoming v. Hathaway,* 525 F.2d 66 (10th Cir. 1975); *Indiana & Michigan Electric Co. v. Environmental Protection Agency,* 509 F.2d 839 (7th Cir. 1975); *South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646 (1st Cir. 1974); *Amoco Oil Co. v. Environmental Protection Agency,* 501 F.2d 722 (D.C. Cir. 1974); *Anaconda Co. v. Ruckelshaus,* 482 F.2d 1301 (10th Cir. 1973); *Buckeye Power, Inc. v. Environmental Protection Agency,* 481 F.2d 162 (6th Cir. 1973); *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615 (D. C. Cir. 1973); *Appalachian Power Co. v. Environmental Protection Agency,* 47 F.2d 495 (4th Cir. 1973).

agement which were subject to the procedures under Chapter 227, Stats., including publication and opportunity for public comment. *See:* Secs. 227.02–227.025, Stats. 1973.

The DNR conducted hearings over the course of eight days; it took the testimony of twenty witnesses, ranging from hydrogeologists and engineers to a concerned citizen. There was testimony regarding the existing and potential environmental effects of the landfill. The agency had before it alternatives to the abandonment schedule, the economic effects of having to use a substitute site, and the economic impact of abandonment on Holtz & Krause. Holtz & Krause submitted two reports, one of which was a massive engineering study of some 650 pages. Both Holtz & Krause and the City had ample opportunity to present information to the agency. The DNR has satisfied the functional equivalent of literal compliance with WEPA as that doctrine has developed in the federal courts.

This court has adopted an exacting standard of judicial review of an agency's decision not to prepare a formal EIS. *See: Wisconsin's Environmental Decade, Inc. v. Public Service Comm.,* 79 Wis.2d 161, 255 N.W.2d 917 (1977); *Wisconsin's Environmental Decade, Inc. v. Public Service Comm.,* 79 Wis.2d 409, 256 N.W.2d 149 (1977). Our holding in the instant case in no way represents a departure from that standard. We delineate a narrow exception from the EIS requirement of WEPA because: (1) an order of the DNR, essentially an environmental regulatory agency acting in that capacity, is at issue; (2) the order was issued pursuant to its legislative mandate "to protect, maintain and improve the quality and management of the waters of the state, ground and surface, public and private," Sec. 144.025(1), Stats.; (3) the order invoked duly promulgated rules; (4) the order followed an extensive hearing

involving twenty witnesses whose testimony covered alternatives to abandonment and the environmental and economic effects of abandonment; and (5) the delay involved in literal compliance with sec. 1.11, Stats., would serve to frustrate the DNR in these legitimate efforts to protect the environment.

The City maintains that the DNR rules and the Governor's "Guidelines" require an EIS. It characterizes this as a Type II action under Wis. Adm. Code sec. NR 150.03 (1) (b) dealing with a "permit amendment." As a Type II action, the DNR rules would require an environmental assessment though not necessarily a formal EIS. The DNR calls this a Type III pollution abatement and enforcement order which, according to its rule, does not require an EIS. The DNR's characterization is reasonable; the City's implausible. The rules require no result different from that reached above, nor do the "Guidelines" issued by Executive Order No. 26. These give criteria to consider in determining when a proposed action is a major action "significantly affecting the quality of the human environment," within the meaning of sec. 1.11, Stats. No contention is made that this is not such an action; the question is whether the DNR is exempt from the EIS requirement despite that fact.

We conclude that the DNR properly applied Wis. Adm. Code sec. NR 151.12 (4) (a), prohibiting landfill operations within 1,000 feet of navigable waters, ordering closure of the site; that the prescribed schedule was supported by substantial evidence; and that the lack of a DNR prepared environmental impact statement does not invalidate the order.

*By the Court.*—That part (paragraph 1) of the judgment, reversing paragraphs 1 through 4 of the DNR order and remanding the case to the DNR for further evidence, is reversed. That part (paragraph 2) of the judgment, affirming the remainder of the order, is affirmed. The

cause is remanded to the circuit court with directions to affirm the DNR order and remand to the DNR for a determination of a date for implementation of the department order.

ABRAHAMSON, J., took no part.